# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 12, 2010 Session

## MELANY FAYE (ELLETT) MORRIS
### v.
## JOHNNY EDWARD MORRIS, II

**Appeal from the Chancery Court of Fayette County**
**No. 14669-PP    William C. Cole, Chancellor**

---

**No. W2010-00293-COA-R3-CV - Filed February 8, 2011**

---

This is a divorce case.  One minor child was born of the marriage.  After the parties filed for divorce, the wife relocated out of state with the parties' child without obtaining court permission to do so.  The husband filed a petition to hold the wife in contempt for relocating out of state with the child.  The trial court declined to hold the wife in contempt, designated the wife as the primary residential parent,  and ordered the husband to pay child support. In dividing the marital property, the husband was ordered to pay the statutory penalty for early withdrawal of the monies in his retirement savings account.  The wife was awarded rehabilitative alimony and attorney fees as alimony *in solido*.  The husband now appeals the relocation decision, the designation of primary residential parent, the assessment of the retirement account penalty, and the award of attorney fees.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Andrew S. Johnston, Minor, Johnston, Douglas, PLLC, Somerville, Tennessee, for Plaintiff/ Appellee, Melany Faye (Ellett) Morris.

Courtney S. Vest, McNabb, Bragorgos & Burgess, PLLC, Memphis, Tennessee, for Defendant/ Appellant, Johnny Edward Morris, II.

## OPINION

### FACTS AND PROCEEDINGS BELOW[1]

Plaintiff/Appellee Melany Faye (Ellett) Morris ("Wife") and Defendant/Appellant Johnny Edward Morris, II ("Husband") were married in 2001. One child was born of the marriage. At the time the parties married, Wife had a daughter from a previous relationship, who resided with Husband and Wife. This was the third marriage for both.[2]

Both parties graduated from high school; neither graduated from college. Husband has worked for many years for gas and oil companies on projects involving gas pipelines. His work has always involved substantial travel.

Wife grew up in Illinois and her extended family lives there. When the parties met in 2001, Wife was living in Illinois and working as a secretary. Husband was in Illinois for work on a project. He traveled to several states in connection with his work, and Wife traveled with him. In 2001, Husband moved to Tennessee for his work, the parties married, and Wife and her daughter moved to Tennessee. Neither party has family in Tennessee.

Husband and Wife purchased a three-bedroom home on some acreage in Somerville, Fayette County, Tennessee. During the marriage, Husband earned as much as $190,000 per year. He also owned as many as fifteen horses for breeding. The parties' daughter was born in 2004. During the marriage, Wife was a homemaker and the primary caregiver for the parties' child and her older daughter; she did not work outside the home.

In the summer of 2007, the parties separated; Wife moved back to Illinois and resumed the job she had held prior to the parties' marriage. A divorce petition was filed in Fayette County, Tennessee. A few months later, in December 2007, the parties agreed to dismiss the divorce petition, and Wife returned to Tennessee.

The cease-fire was short-lived. In March 2008, Husband filed another complaint for divorce, this time in Mississippi, where he was working on a pipeline job. Later that month, Wife filed a divorce complaint in the Chancery Court in Fayette County, Tennessee.

---

[1]The proceedings in this matter were extensive. We limit our discussion to the pleadings and proceedings relevant to the issues raised on appeal.

[2]Husband has three daughters in addition to the parties' child. Two were grown as of the trial date. The third was a teenager who spent residential parenting time with Husband but lived primarily with her mother.

The ensuing separation proved to be tumultuous. In June 2008, Wife abruptly moved, with her older daughter and the parties' child, to Illinois. The parties dispute whether the move was planned in advance by Wife, or whether it was forced upon her because Husband locked her out of their Tennessee home. At any rate, Wife and her daughters moved in with Wife's aunt in Illinois, and Wife resumed her prior secretarial position. Wife's extended family assisted Wife with child care.

The difficulties inherent in co-parenting over such distance, coupled with Husband's anger over Wife's involvement with a man in Illinois, spawned many disputes. This culminated in an incident that occurred in December 2008 when Wife, her then-twelve-year-old daughter, and the parties' then-four-year-old daughter, met Husband in Illinois for Husband to begin a week of residential parenting time with their young daughter. When Wife disembarked from the SUV to take the four-year-old's luggage out of the vehicle, Husband jumped into the driver's seat. The children quickly got out of the SUV and Husband sped away in the vehicle, leaving Wife and the daughters standing in the parking lot.

In January 2009, the Tennessee trial court conducted a *pendente lite* hearing to consider, among other things, Husband's petition to hold Wife in contempt of court for moving with the child to Illinois without permission from the trial court. The trial court declined to hold Wife in contempt, temporarily designated her as the primary residential parent, and awarded Wife *pendente lite* child support.

All of the divorce-related difficulties apparently took a toll on Husband's work. In 2008, Husband was fired from his job. He then began his own consulting business, doing the same type of work, and was able to maintain an income in excess of $100,000 per year.

The situation was further complicated by the parallel court proceedings in Mississippi and Tennessee.[3] Husband purchased a home in Mississippi, and claimed to be a Mississippi resident. In addition, Wife had great difficulty effecting service of process on Husband in the Tennessee litigation. Finally, in February 2009, Husband's divorce complaint in Mississippi was dismissed. Shortly after Husband's Mississippi divorce complaint was dismissed, he moved back to the marital home in Somerville, Tennessee. The Tennessee divorce proceedings then continued apace.

The Tennessee court conducted the trial on the parties' divorce on September 10, 2009. At the outset of the trial, Wife stipulated that she had committed adultery, and that Husband was entitled to a divorce on that ground. The issues that remained for trial included each party's

---

[3] Apparently Husband also filed another lawsuit in federal court in Illinois against the Illinois man with whom Wife was involved.

request to be designated as the primary residential parent and the attendant requests for child support, Wife's request for rehabilitative alimony, the division of the marital property and the allocation of the marital debt, and Wife's request for an award of attorney fees. The testimony at trial came primarily from Husband and Wife. At the time of trial, Husband was fifty-three years old, and Wife was thirty-nine years old.

Husband testified first. He asserted that Wife had planned in advance her move with the children to Illinois, and explained the basis for his belief. Husband said that on June 11, 2008, he was driving south on a highway through Martin, Tennessee, and passed Wife on the same highway, traveling north toward Illinois, driving the parties' SUV while pulling a white cargo trailer.[4] Husband said that, several days later, he had a neighbor go to the Somerville residence and put a chain with a lock on the gates at the entry to the property.[5] Husband denied locking Wife out of the Somerville house, and asserted that Wife moved to Illinois so that she could be with the Illinois man with whom she was involved.

Husband also testified about the incident in which he took the SUV that Wife had been driving. He explained that he "regained possession" of the SUV because Wife had allowed persons not covered by insurance to drive the vehicle, including her Illinois paramour, she damaged the vehicle, and she disabled the vehicle's OnStar equipment.[6] Husband said that, after he drove away in the SUV, Wife and the daughters had a way to get home, because Wife's parents had accompanied her to the exchange for Husband's parenting time with the parties' daughter. Husband's scheduled parenting time, however, did not take place in the wake of his departure with the vehicle.

Husband testified that, at the time of trial, he was employed as an independent consultant with two different companies. He said that in 2006 his gross income was $190,480, in 2007 his gross income was $174,696, and in 2008 his gross income was $143,005. As of the trial date in September 2009, Husband had earned approximately $100,000 for the year.

---

[4]In the *pendente lite* hearing, Husband claimed that after he saw Wife traveling on the highway with a trailer, he went to the Somerville marital residence and found Wife's parents, who were staying at the home, taking marital property out of the home. In the September 2009 trial, Husband testified that he did not go to the Somerville home on June 11, 2008.

[5]Wife's parents had been staying at the Somerville residence for some time because Wife's father was seriously ill. Husband asserted that the purpose of the chain and lock was to prevent Wife's parents from removing more marital belongings from the property.

[6]Husband testified that the OnStar equipment on the vehicle included a telephone that was always on, unless the OnStar capability was disabled or disconnected.

Husband said that, during the marriage, he had a 401(k) retirement savings account with a prior employer, valued at approximately $70,000. In 2008, Husband cashed out the account because he was concerned about the falling value of the account caused by the general economy. Consequently, he was assessed a statutory ten-percent early withdrawal penalty on his 2008 tax return. Husband said that, prior to the marriage, there was approximately $6900 in the account. The proceeds that remained from his 401(k) account were kept in cash at the marital residence.

Husband also testified on his request to be designated as the child's primary residential parent. He said that he had moved back into the marital home in Somerville in part for the benefit of their daughter. Husband said that he and their daughter enjoy being together and share an interest in horses, and that the child had participated in horse shows.

Husband acknowledged that, during the marriage, Wife was primarily responsible for caring for the child. He also conceded that he does not have any family living in Tennessee. Husband insisted, however, that, as a consultant, his work schedule was flexible. He claimed that, as a consultant, he traveled less than twenty percent of the time, and thus would be able to spend time with the parties' child. He said that if he were designated the primary residential parent, he planned to rely on a neighbor's sister-in-law to help care for the parties' child, and would utilize a full time nanny when his work necessitated travel. Husband could not remember the name of the child's Somerville pediatrician, but said that he knew where the physician's office was located. Husband seemed to acknowledge that the parties' child had allergies, and alluded to treating her with over-the-counter medicines. He later expressed uncertainty about her diagnosis, explaining that he had never been furnished a formal report. Husband asserted that Wife did not communicate effectively with him regarding any subject, including the parties' child. He also claimed that Wife did not facilitate his relationship with the child, and said she refused to allow him to take the child to his Mississippi home when he lived in Mississippi.

Husband also testified that, even if Wife remained the primary residential parent, the court should require her to return to Tennessee. He described the difficulty for the child of the long drive between Tennessee and Illinois, which made normal residential parenting time for him "not feasible." Husband also objected to their child spending time with Wife's Illinois paramour, with Wife's brother in Illinois with a criminal record, and with another friend of Wife's whom Husband alleged was mentally unstable.

After Husband testified, he presented the testimony of Tennessee neighbors who corroborated his assertion that Wife planned her move to Illinois and moved marital belongings out of their home prior to her move. He presented the testimony of other

witnesses, who said that he was a good parent to the parties' child and to Wife's older daughter.

Wife testified as well. She described how she came to move back to Illinois in June 2008. Wife said that her oldest daughter had been in Illinois, staying with Wife's aunt, in order to participate in a basketball camp. Wife's parents were still staying in the marital home in Somerville, due to the illness of Wife's father. Wife and the parties' child traveled to Illinois to pick up her oldest daughter from basketball camp, and after they left, Husband put a chain and lock on the entrance to the property, and cut the line to the telephone box.[7] She claimed that Husband sent her parents a blunt message to get out of the parties' home.

Consequently, Wife said, she was unable to return to the Tennessee home, and she and the daughters moved into her aunt's home in Illinois where Wife grew up. Wife's parents and her extended family all live in the area. The parties' child was enrolled in a school in Illinois, had made friends there, and had several young cousins nearby. Wife was working as a secretary at the same place she worked for several years, prior to the parties' marriage.

Wife also described the December 2008 incident in which Husband took possession of the SUV she had been driving. She testified that she and her daughters had driven to a location in Illinois to meet Husband, for their child to begin a week of residential parenting time with him. Wife parked in the parking lot close to Husband's vehicle and, with the daughters still in the SUV, got out to retrieve the child's luggage for the extended visit. When she got out, Wife said, Husband suddenly jumped in behind the wheel of the SUV and told her he was taking the vehicle. After Husband and Wife briefly struggled over the car key, Husband drove off, leaving Wife and the daughters standing in the parking lot. Wife claimed that their four-year-old daughter became apprehensive after that incident, and kept asking why Daddy took their car.

At trial, Wife sought rehabilitative alimony in the amount of $500 per month for thirty-six months. She also sought attorney fees in the amount of $25,000. Referencing the pretrial memorandum listing her income and expenses, Wife said she earned $1916.80 gross wages per month from her employment as a medical secretary, and also received $452 per month in child support for her daughter from a previous marriage, and $854 per month in child support from Husband for the parties' minor child. Wife testified that an award of rehabilitative alimony would enable her to enroll in a local college and obtain a degree. Wife

---

[7]Wife explained that before she left Tennessee to travel to Illinois to pick up her daughter from basketball camp, "I had loaded some stuff up and put it in a storage [in Tennessee] because I knew that at some point I was either going to have to move – be close for a job or do something with school because I couldn't afford it without [Husband's] income."

admitted to a relationship with an Illinois man, but denied that the man had spent the night in the presence of the parties' minor child.

Wife testified in favor of her request that she continue to be designated as the child's primary residential parent. She said that she had always been the child's primary caregiver, taking care of her day-to-day needs as well as her medical issues. Wife said that the parties' child is highly allergic to numerous common foods and other substances,[8] and receives weekly allergy shots. She testified that her older daughter and the parties' child have a close relationship, and do many activities together. Wife said that she works from 8 a.m. to 5 p.m. every day, and asserted that she provided their child a more stable and structured environment than Husband could provide. She said that the child has friends in Wife's Illinois neighborhood, is enrolled in preschool there, and attends church.

Responding to Husband's allegations, Wife explained that she refused to let Husband take the child to Mississippi because he had made repeated threats to take the child, and Wife was concerned that he would not return the child to her. During that time, she said, she told Husband he was free to come see their daughter at her home in Illinois. Once a temporary parenting order was entered, Wife said, she was flexible on Husband's parenting time, and agreed to modifications when he asked for them. Despite her accommodations, Wife testified, Husband's demeanor with her remained curt and nasty, complete with name-calling. She denied preventing Husband from exercising his telephone parenting time, but said that she did not allow Husband to speak to the child during times in which she "couldn't get a word in without being cussed upside down, being called names and so forth like that." In light of their inability to communicate, Wife sought to have sole decision-making authority on parenting issues.

In further response to Husband's allegations, Wife acknowledged that her brother had past legal troubles and jail time, but indicated that those troubles were behind him. She conceded that her female friend had had had emotional difficulties, but said that she did not leave their child in the care of that friend.

On the issue of attorney fees, Wife testified that she had to borrow money from her parents to retain an attorney, and that additional monies were required because she needed representation in both Tennessee and Mississippi. During this time, Wife said, she did not receive any financial assistance from Husband. On the 401(k), Wife stated that Husband did not speak to her about withdrawing money from the account before he did it.

---

[8]Wife testified that their child was diagnosed at two years old, and is allergic to milk, eggs, peanuts, corn, horses, cats, dogs, grass, ragweed, and mold.

Wife presented the testimony of her older daughter, age thirteen at the time of trial. The older daughter testified that she is very close to her younger sister, and that they engage in activities together such as riding bicycles and going to the playground. At the conclusion of the trial testimony, the trial court took the case under advisement.

The trial court issued an oral ruling on September 17, 2009, and the final decree of divorce was entered in December 2009. The divorce was awarded to Husband on the ground of Wife's adultery. On the parenting issues, the trial court expressed concern about the hostility and acrimony between the parties. The trial court found that Wife had always been the primary caretaker for the parties' child, and also expressed a desire for the child to maintain her close relationship with Wife's older daughter, the child's half-sister. Husband was admonished for his conduct in taking Wife's SUV, and the trial court commented that it appeared that Husband was more interested in getting the vehicle than in having residential parenting time with his daughter. After considering all of the applicable statutory factors, the trial court designated Wife as the primary residential parent. Husband was given parenting time during the fall and spring breaks, the Christmas break, and five weeks in the summer. Wife was awarded child support.

The trial court addressed Wife's relocation from Tennessee to Illinois. It found that "neither party was particularly credible" on whether Wife planned in advance to move to Illinois or whether she was prompted to move there because Husband locked her out of their Tennessee home. Regardless, the trial court noted, Wife had valid reasons for returning to Illinois since her family and her job prior to the marriage were both there. Consequently, had Wife requested permission in advance for the move, she would have been allowed to return to Illinois. Therefore, the trial court did not require her to return to Tennessee.

The trial court divided the marital property and allocated the marital debt. Husband was awarded the marital home and the horses. The remaining value of Husband's 401(k) was split between Wife and Husband, and Husband was assessed responsibility for the ten-percent penalty for early withdrawal. The trial court apportioned the credit card debt between the parties.

The trial court declined to award Wife rehabilitative alimony, but awarded her transitional alimony in the amount of $500 per month for twelve months to allow her to adjust to the economic consequences of the divorce.

The trial court also addressed Wife's request for an award of $25,000 in attorney fees. The trial court awarded Wife $5,000 in attorney fees as alimony *in solido* "because much of the litigation was engendered by Husband trying to file for divorce in Mississippi and his

avoidance of service of process which raised attorney's fees for each party for no rational reason."

Husband now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Husband raises four issues on appeal. Husband asserts that the trial court erred by allowing Wife to remain in Illinois with the parties' minor child after she relocated without notice or prior permission of the trial court. He argues that the trial court erred in not designating him as the primary residential parent once Wife relocated to Illinois. Husband also claims that the trial court erred in assessing against him the penalty for the early withdrawal of the funds in Husband's 401(k). Finally, he contends that the award of attorney fees to Wife was erroneous.

On appeal, Wife argues that the trial court's ruling should be affirmed. She seeks an award of attorney fees on appeal.

We review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates to the contrary. ***Watson v. Watson*** 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005); TENN. R. APP. P. 13(d). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." ***The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Issues of credibility are resolved by "the trial court who saw and heard the witnesses testify and is therefore in the position to determine credibility. ***Bowman v. Bowman***, 826 S.W.2d 563, 567 (Tenn. Ct. App. 1991) (citation omitted). Therefore, "we review a trial court's determinations of witness credibility with great deference and will not re-evaluate a judge's credibility determinations unless they are contradicted by clear and convincing evidence." ***In Re: Benin H.***, No. E2009-02485-COA-R3-CV, 2010 WL 5549049, at *12 (Tenn. Ct. App. Dec. 29, 2010) (citing ***Wells v. Tenn. Bd. Of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999)). We review questions of law *de novo* on the record, with no presumption of correctness. ***See State v. Levandowski***, 955 S.W.2d 603, 604 (Tenn. 1997); ***Ridings v. Ralph M. Parsons Co.***, 914 s.W.2d 79, 80 (Tenn. 1996); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

Because a trial court's decision on the designation of primary residential parent often hinges on subtle factors such as the parents' demeanor during the proceedings, trial courts are given broad discretion to fashion appropriate arrangements that best suit the unique circumstances of a given case. ***Adelsperger v. Adelsperger***, 970 S.W. 2d 482, 485 (Tenn. Ct. App. 1997).

Trial courts are also vested with broad discretion in dividing the marital estate equitably in a divorce proceeding. *Flannery v. Flannery*, 121 S.W.3d 647, 650 (Tenn. 2003). Therefore, we will not disturb a trial court's division of the marital estate on appeal "unless the distribution lacks proper evidentiary support or results from an error of law or a misapplication of requirements and procedures." *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

Finally, the trial court's decision on whether to award attorney fees is reviewed under an abuse of discretion standard as well. *Richardson v. Spanos*, 180 S.W.3d 620, 729 (Tenn. Ct. App. 2005); *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586 at * 17 (Tenn. Ct. App. Aug. 23, 2004). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

**ANALYSIS**

**Relocation and Primary Residential Parent**

Husband asserts that the trial court erred by allowing Wife to relocate with their child to Illinois. Husband asserts that Wife's relocation violated T.C.A. § 36-4-106(d)(5), which sets forth the temporary injunctions that are automatically in effect once a petition for divorce has been filed and served. They include:

> An injunction restraining both parties from relocating any children of the parties outside the state of Tennessee, or more than one hundred (100) miles from the marital home, without the permission of the other party or an order of the court, except in the case of a removal based upon a well-founded fear of physical abuse against either the fleeing parent or the child

T.C.A. § 36-4-106(d)(5) (2005). As it is undisputed that Wife did not obtain the permission of the trial court before relocating, and there was no allegation of physical abuse, Husband asserts that Wife violated this statute, should have been held in contempt, and should not have been permitted to stay in Illinois. He denies any allegation that Wife was locked out of the marital residence, and claims that the evidence shows that Wife moved from the marital residence with certain belongings in a white trailer while ostensibly going to Illinois to retrieve her older daughter from a basketball camp. He maintains that the move furthered Wife's goal of denying him contact with their child, and argues vigorously that she should not be permitted to get away with it.

Husband also asserts that the trial court erred in designating Wife as the child's primary residential parent. He notes that, before Wife abruptly moved to Illinois, the child had spent her entire life in Tennessee, in the marital residence in which Husband now lives. He claims that Wife will not communicate with him, and says that he "believes that if the child remains in Illinois, he will not be a part of her life." He contends that the eight hour distance between them is difficult for him and for the child. Husband also argues that the parenting schedule established by the trial court is inequitable, and that the allocation of sole decisionmaking authority to Wife was erroneous.

A trial court's decisions on parenting arrangements and the designation of the primary residential parent are "among the most important decisions confronting a trial court in a divorce case." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (quoting *Rice v. Rice,* No. M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. July 19, 2001)). In making such a decision, the needs of the child are paramount, and the desires of the parents are secondary. *Id*. The inquiry is necessarily factually driven, and the trial court must take into consideration all of the facts and circumstances of the case in reaching its conclusion. *Id.* (citing *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990), *overruled on other grounds*, 924 S.W.2d 623 (Tenn. 1996)). In choosing which parent to designate as the primary residential parent for the child, the court must conduct a "comparative fitness" analysis, requiring the court to determine which parent would be comparatively more fit. *Id.* (citing *Bah v. Bah*, 668 S.W.3d 663, 666 (Tenn. 1983)).

Trial courts have broad discretion in making custody determinations, but those determinations must be based on the proof at trial and the applicable principles of law. *Id.* (citing *Rice,* 2001 WL 812558, at *2 (citations omitted)). The decision frequently hinges on the trial court's assessment of the credibility of the witnesses at trial, determinations which are accorded great weight on appeal; consequently, appellate courts are loathe to second-guess a trial court's conclusion. *Id*. With these principles in mind, we turn to the trial court's decision in this case.

We first consider Wife's relocation to Illinois. Husband correctly observes that Wife moved to Illinois without notifying him or obtaining the permission of the trial court, and suffered no adverse consequences from this act. However, both parties recounted differing versions of the facts surrounding Wife's move, and the trial court found that neither was "particularly credible." As noted above, the trial court's assessment of the witnesses' credibility is accorded great weight on appeal. *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). If the trial court declined to credit Husband's version of the events, we are not at liberty to do so.

In the case at bar, the trial court entered an order *pendente lite* designating Wife as the primary residential parent, after she moved to Illinois. This was, of course, not a final order, and the matter remained in the bosom of the trial court. The trial court's December 2009 order, the order from which Husband appeals, is considered an initial custody determination, and we analyze it as such.

This Court has held that, where the trial court considers the relocation of the parent seeking to be designated as the primary residential parent, it is to consider the parent's relocation in making its best interest analysis under T.C.A. § 36-6-106. *See Rudd v. Rudd*, No. W2009-00251-COA-R3-CV, 2009 WL 4642582, at *6 (Tenn. Ct. App. Dec. 9, 2009); *Gregory v. Gregory*, No. W2002-01049-COA-R3-CV, 2003 WL 21729431, at *2-3 (Tenn. Ct. App. July 14, 2003).

In this cause, the trial court relied heavily on the fact that Wife had always been the child's primary caregiver. Husband testified that he travels less often and has a more flexible work schedule than he had maintained in the past; however, his work still requires frequent travel out of town. Husband's testified that he would hire his neighbor's sister-in-law, whose last name he could not remember, to care for the child in his absence. In Illinois, Wife has a structured job during business hours with no travel and can be home with the child each evening, and has members of her extended family available to assist in child care. Thus, the evidence indicates that, in Illinois, Wife is able to provide the child with a stable, structured environment, and Husband's testimony does not indicate that he can provide a comparably stable environment. Moreover, Wife testified about the child's extensive allergies, and Husband's testimony indicated little knowledge or understanding of the child's medical condition or needs. The trial court also cited the importance to the child of her relationship with her older half-sister. After a careful review of the record, we find that there is ample evidence to support the trial court's decision.

Husband cites the serious obstacles presented by the 8-hour distance between his home and Wife's home in Illinois, and worries that the result will be that he is no longer a part of his child's life. We take seriously Husband's concern. The distance is a substantial impediment to the child having a close, healthy relationship with her father, and this is no small matter. Under all of the circumstances in this case, however, we cannot conclude that the trial court erred in designating Wife as the primary residential parent, and in declining Husband's request to require her to return to Tennessee. We note, however, that Wife's choice to relocate to Illinois, and her designation as primary residential parent, place a considerable burden on her to work to facilitate their child's relationship with her father.[9]

---

[9]In any custody modification proceedings that may arise in the future, the court will consider each parent's
(continued...)

Husband also objects to the residential parenting schedule fashioned by the trial court. Certainly the great distance between the parties' homes makes scheduling the residential parenting time for the alternate residential parent a challenge. Overall, we cannot say that the trial court erred in the schedule it adopted.

Finally, Husband argues that the trial court erred in granting Wife the primary decisionmaking authority. Sadly, there is ample support in the record for this decision. This Court has noted that "joint custody" awards are generally viewed with some disfavor, and are appropriate only where there is specific proof that such an arrangement is in the child's best interest. *See In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *6 (Tenn. Ct. App. Feb. 17, 2010). Here, it is undisputed that the parties do not communicate with each other, about the child or anything else, although each blames the other. The trial court found that both failed in this regard, and the record supports this finding. Under such circumstances, the trial court had little choice but to grant Wife primary decisionmaking authority.

Accordingly, we affirm the trial court's decisions on Wife's relocation, the designation of primary residential parent, the parenting schedule, and the allocation of parenting responsibilities.

## Early Withdrawal Penalty

Husband also appeals the trial court's decision to allocate to him the ten-percent penalty for early withdrawal of the monies in his 401(k) account. At trial and on appeal, Husband claimed that he withdrew all of the money in his 401(k) account only because the account was losing value so precipitously.[10] He argues that, despite the ten-percent penalty for early withdrawal, his decision was financially prudent because the account would have lost even

---

[9](...continued)
"willingness . . . to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent." T.C.A. § 36-6-106(a)(10) (2005).

[10]Husband testified at trial that he:

> ...[S]at there and watched [the 401(k)] plummet, and it kept losing, and- I don't know the percentage that I lost before I took it out, but, to watch the news every day and to watch, you know, stocks plummeting and you know your 401(k) is plummeting, I took it out before the damage got so bad that I didn't have hardly anything left.

more had he not withdrawn the proceeds. Under these circumstances, Husband argues, the penalty should not be allocated to him.[11]

In dividing the marital property and the marital debt, the trial court is required to divide both equitably, without regard to fault. ***Hunsinger v. Hunsinger***, No. M2008-02434-COA-R3-CV, 2009 WL 43931345, at *5 (Tenn. Ct. App. Dec. 21, 2009) (citations omitted). The trial court has substantial discretion when dividing the marital estate, and its decision will be given "great weight" on appeal. *Id.* (citations omitted). Appellate courts are disinclined to disturb the trial court's distribution unless it lacks evidentiary support or results from an error of law or misapplication of statutory requirements. ***Herbison v. Herbison***, No. M2008-00658-COA-R3-CV, 2009 WL 1634914, at *6 (Tenn. Ct. App. Jun. 10, 2009) (citations omitted).

The trial court divided the proceeds from Husband's 401(k) between Husband and Wife as follows:

> And what I did was I took the total value of the 401(k), subtracted out the penalty and the taxes and then determined the percentage that the taxes and the penalty was to the amount of the 401(k). Pro rata I took that against [Husband's] pre-marital interest and found that his pre-marital interest was worth $4,205 after taking into consideration the taxes and penalty. Then I reduced the amount of cash on hand, which was $49,520 by the $4,205 and arrived at $45,315. I divided that in two. I do not feel that I should allocate all of the taxes to [Husband] because the taxes would have to be paid at some point, but I did allocate the penalty to Husband. So the half of the penalty that would apply to [Wife's] share of the 401(k) was $3,166, so I added that amount to her share and subtracted that amount from [Husband's] share.

Accordingly, the trial court allocated to Husband the financial responsibility for the early withdrawal penalty.

In this case, the trial court found that Husband earns in excess of $12,000 per month, and Wife earns approximately $2000 per month. Assuming that Husband is correct in his assertion that early withdrawal was a financially prudent decision, Husband is clearly in a better position to pay the statutory penalty. We find no error in the trial court's decision to allocate the 401(k) penalty to Husband.

---

[11]Husband also argues that "the trial court made no findings as to Wife's contribution to the preservation and appreciation of Husband's 401(k)." It is unclear how this relates to the issue of whether Husband should be allocated the statutory penalty for early withdrawal of the 401(k). This argument is without merit.

**Attorney Fees**

Husband asserts on appeal that the trial court erred in awarding Wife $5000 in attorney fees as alimony *in solido*. T.C.A. § 36-5-103(c) permits a trial judge to award attorney fees in certain proceedings involving child custody.[12] An award of attorney fees is treated as alimony. ***Kinard v. Kinard***, 986 S.W.2d 220, 235-36 (Tenn. Ct. App. 1998) (citing ***Smith v. Smith***, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); ***Gilliam v. Gilliam***, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988)). As such, a decision to award attorney fees is within the sound discretion of the trial court. ***Aaron v. Aaron***, 909 S.W.2d 408, 411 (Tenn. 1995).

> The trial court explained its award of attorney fees to Wife as follows:
>
> I do find . . . that much of the litigation was engendered by [Husband] trying to file for divorce in Mississippi and his avoidance of service of process. That raised attorney's fees for everybody for no rational reason, especially since the parties had consented to the jurisdiction of this Court and the case dismissed three months before he filed the Mississippi case.

As detailed below, there is ample support on the record for the trial court's decision.

In the summer of 2007, Wife filed a complaint for divorce in Fayette County, Tennessee. She relocated temporarily to Illinois with the children. Several months later, amid talk of reconciliation, the divorce complaint was dismissed and Wife and the children returned to Tennessee. At the time, Husband was in Mississippi working on a pipeline project.

Several months after that, Husband filed a divorce petition in Mississippi, where he was working, despite the fact that neither Wife nor their child had ever resided in Mississippi and the marital home was in Tennessee. Asked at trial why he filed his divorce complaint in Mississippi, Husband explained:

---

[12] Specifically, T.C.A. § 36-5-103(c) states:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court

T.C.A. § 36-5-103 (2005).

Q: Well, why didn't you file here [in Tennessee] rather than down in Mississippi?

A: When I came to court here [in Tennessee] in October of 2007, [Wife's] attorney made a big deal about me being on the road and wanted to act like I wasn't even a resident of Fayette County at that time. . . .

So, when I decided to file for divorce, I was very close to making jurisdiction in Mississippi, and that's where I chose to file.

I had been there the amount of time it took to meet jurisdictional requirements.

This, of course, necessitated Wife hiring a new lawyer, one who was licensed in Mississippi as well as Tennessee. She re-filed a divorce complaint in Tennessee, and the competing divorce proceedings ensued.

In May 2008, Wife filed in Tennessee a notice of attempted personal service of process, detailing her numerous attempts to serve Husband with the Tennessee complaint for divorce. A few days later, Husband filed a motion to dismiss Wife's Tennessee divorce complaint, alleging that the Tennessee court lacked jurisdiction and that he had not been served with process. Husband claimed that Wife was not a resident of Tennessee for the six-month period preceding the filing of her complaint because she had moved to Illinois, and that Husband had resided in Mississippi for at least six months before filing his complaint for divorce in Mississippi.

In June 2008, Wife filed a motion in the Tennessee court to deem Husband to have been served with process. In the motion, Wife detailed her attempts to serve Husband with the Tennessee divorce complaint, including attempts to fax, mail, and employ a private process server to serve Husband at work. Wife's attorney stated that she had provided Husband's Mississippi attorney with the same information. After a hearing, the Tennessee trial court ordered Husband's Tennessee attorney to accept service of process on behalf of his client.

The Tennessee trial judge then stated: "What I'm going to have to do in that regard is have communication with the judge in Mississippi." After months of such pointless skirmishing, the Mississippi complaint was dismissed. Not long after that, Husband returned to the marital home in Tennessee.

All in all, it appears that the only thing accomplished by Husband's actions in Mississippi was to force Wife to incur additional expense and effort. Under the circumstances, we find that the trial court's award of $5000 in attorney fees was supported by the record, and indeed was conservative. Accordingly, we affirm the award of attorney fees by the trial court.

Wife seeks an award of attorney fees incurred in this appeal, pursuant to T.C.A. § 36-5-103(c).  Exercising our discretion, we grant Wife's request.  Therefore, we remand the case to the trial court for proceedings to determine the reasonable amount of such fees.

### CONCLUSION

The decision of the trial court is affirmed and the cause is remanded for further proceedings consistent with this Opinion.  Costs on appeal shall be taxed to the Appellant Johnny Edward Morris, II and his surety, for which execution may issue, if necessary.


_____
HOLLY M. KIRBY, JUDGE